May it please the Court, Stuart Grant on behalf of the Connecticut Retirement Plan. Your Honor, there's really two fundamental errors that were committed here, even though the briefs specify a lot of issues. The first fundamental error is that the district court failed to recognize that a statement can be literally true and yet still be misleading. The second fundamental error is the district court failed to recognize that a partial disclosure can let the inflation out of a stock price without the full truth being revealed. Counsel, I think you're right on both of those general propositions. I have a specific problem with this case. Applying them. Let me tell you what it is so you can educate me. It looks to me as though the fraud here was not on the shareholders. It was on the customers. The company was driving people who work for the customers in order to get sales. That's certainly fraud, and it may be both civilly and criminally actionable, but the victims of the fraud are not the shareholders of the company that's bribing the customer's agents. They're the beneficiaries of the fraud. Partially true, but I think misses the point a little bit. Explain. And that is that while the current shareholders might have benefited from the fraud, from we've gotten sales that we wouldn't have gotten, and so I agree with you on that part. The class is those who are purchasers of the securities, and the way they are fooled is that they look at revenue numbers coming in and they look at statements from the company saying we had revenues of $40 million this year. Our products are being extremely well received. We have sold to some of the largest telecom companies in the country. All true so far. All true so far. But what is it that they don't know? They don't know that the only reason we were able to do so is because we bribed those folks. And that's why literally true, but misleading. So I guess the theory is don't rely on these sales to predict the future because the people we bought may not stay bought? No. Well, partially that. What's happening is that folks use information in their own minds to then predict what do they think is going to happen. And that's why someone would buy a stock. I mean, the standard way of valuing a stock is what are the discounted cash flows in the future. That's how I know what the value is. And in order to do that as a potential purchaser, I'm saying, well, what is this company going to do? Now, the company is not necessarily going to tell me what they will do in the future, and that's not their obligation. But their obligation is to disclose what's happened in the past and currently. And how can I then extrapolate from that? And if I'm only given part of the information that says we made these sales, I'm going to believe that these sales are legitimate sales. If I'm told that there is a demand for this product is of good quality, it provides a service, and that, therefore, others may buy it. Counsel, just speaking for myself, I don't know what my colleagues think on this, but let's assume for a moment that I agree with what you've talked about so far. But I'm troubled by the loss causation issue here. Where have you pled loss causation? Isn't that the real stumbling block of your case? Well, the district court dismissed it on two grounds, on loss causation and the fact that he said there was no false or misleading statement. And interestingly enough, the loss causation is derivative of that. There was a lot going on in the telecommunications industry at the same time, right? Absolutely. And the stock dropped from 150 to zero. And we're not asking for all of that. So on pages 19 through 21 of our opening brief, and 39 and 44, we get into a discussion of that very specific issue. And we explain that the first announcement is March 11, 2002. And there's an announcement that the SEC has commenced an investigation of Quest's revenue recognition practices. Now, Quest is by far Redback's largest customer. And let me use a quick baseball analogy, because I think it really will bring it right into focus. Before you go there, I'm just looking at my notes here. What my notes indicate, that the alleged fraudulent acts were revealed through a series of partial disclosures from March 11, 2002 to October 10, 2003, which caused the drop in the Redback stock price from 4.30 a share to 27 cents per share. And the question I would have is, did you adequately plead how this series of disclosures revealed the truth of Redback's fraudulent misrepresentations? Yes, sir, we did. And where? Well, as I said, we listed on paragraph, starting on page 19, it gives you a site for each and every one of the various paragraphs of the complaint. Could you talk about the paragraphs of the complaint? It's so long, it's sort of hard to find stuff. So your help would be great. So, for example, we just started talking about the March 11, 2002 announcement that the SEC had commenced an investigation of Quest's revenue recognition practices, focusing on sales of IRUs and the sale of equipment by Quest to its customers from which Quest bought Now, I think it's also very important to point out to the Court that the Court found that we actually adequately pled this. In the March 20, 2006 opinion, the district  attorney, Judge Fogel, says the Court notes that the TAC provides much more specificity than Plaintiff's previous pleadings with respect to the alleged illicit transactions, and the Court is satisfied that Plaintiffs have proved the basis for the belief that those transactions occurred. So starting from there, now we say, okay, how does these things relate to the fact that everyone knows that Quest is Redback's largest customer? And all of a sudden, Quest begins to – is investigated by the SEC. I don't know if this all of a sudden got appreciably louder. I don't – I think somehow the volume got turned up. I don't know what happened. I apologize if it sounds much louder. No, no, it's okay. For example, Your Honor, it's like when Balco was being investigated for giving steroids to unnamed baseball players. Now, everyone knew Barry Bonds was Balco's biggest client. And so even though the government was very careful not to release that it's Barry Bonds we're looking at when we're investigating and subpoenaing Balco – I'm not sure you're right about that, but – What you're saying is that the causation is if Quest is having trouble, Redback's going to have trouble. It's even closer than that. However, that's not secret. Everybody knows that Quest is Redback's biggest customer. It's not trouble. If Quest is being investigated by the SEC for revenue recognition having to do with bogus sales, having to do with offsetting sales, with corporate bribery, with all of these other things, there's a decent chance that Redback is involved in it. Why? Because it's its biggest customer. So that's the first one that comes out. So all of a sudden your biggest customer is being I'll go with you on that for the moment. Okay. How does it track with the stock price? It looked to me like the $150 to $0 happened independently of Quest problems. $150 to foreign change, let's say $4.50, independent, not suing for that. I was thinking it went down to $0.27. So from $4.50 to $0.27, we are saying that that drop is related to the fraud. Oh, I see. So you're saying the $150 to $4.00 in some sense is not caused. But the $4.00 in some sense to $0.27 is. And that's where your page 19 in your brief is. Yes. And that's actually yes. I believe that the fraud caused the stock to be artificially inflated to run all the way up to $150. But is this court correctly held in the Supreme Court incorrectly reversed? That doesn't get you damages. So the when. So on the way down, I can't tell you that the inflation was let out because from $150 to $4.50, because the market knew about the. How can you say it from the other drop, though, from $4.50 down to $0.27? That's where I go. We just discussed what happened with the March 11th announcement. And in the 11 trading days from after March 11th, that stock drops 19 percent. And we can show, you know, which we will at trial put in an expert there that that is a statistically significant move. That's not the telecom industry dropping in those 11 days. That's redback dropping. Then we go on. No, it's statistically significant, but it's not terribly persuasive. Statistically significant means less than a 5 percent chance of occurring by chance. That's all the word means. A 16 percent drop in a stock just happens all the time. And I would have expected when the market learns that the whole thing is built on fraud, that the drop would be a lot more than that. Oh, yes. But it doesn't learn that the whole thing's on fraud. Remember, this is partial disclosures. So the first thing it learns is that Quest is playing games with its customers in how it's dealing with this. And so there's a 19 percent drop pretty quickly. Then we go on and we have other drops. In April 10th, redback all of a sudden reports hugely disappointing earnings. Why? Because all of those sales that it was buying before, they dry up. So we know that inflation now comes out a second time because things that were there are no longer there. Now, people don't know why. They know they're no longer there, but they don't know that they were originally there because of fraud. Then later, when Quest announces that the SEC civil probe is leading now to a criminal investigation, the shares of redback drop again. So we can see the relationships. And it drops. You know, basically, you'll see that in the time that it drops, it drops, you know, almost 90 percent. And we can pinpoint it to these events as opposed to other telecom companies, which are not dropping, you know, in 2002 to 2003 by 90 percent. So we can see that there are specific events that are causing these drops and not just random walks on Wall Street, but specific events. And that those drops, we can take out market reaction and all that from the general market, from the industry, to show that it's really tied to that. And that's what we have to do. And that's what we've pled. That's what we can prove. And that's why the district court erred. Your Honor, heeding your advice at the beginning, unless you have another question, I'm going to sit down quickly so I get two minutes left. Thank you, counsel. Thank you. May it please the Court. My name is Terry Johnson, and I represent the Appalese individual defendants in this case. Your Honor, I'd like to start with loss causation because that's dispositive of the case. I'm sorry, I couldn't hear you. Loss causation is dispositive of this case. The plaintiff needs to plead two things in the complaint to adequately make out loss causation. One is that there was a revelation of the truth about Redback's supposed fraud. And the second thing is that this caused a decline in the stock price and therefore a loss to the plaintiff class. The plaintiff can't plead, hasn't pled, either of those two things. Let's start with that March 11th announcement that they say is the, quote, revelation of the fraud about Redback. Well, that announcement was a press release by Quest. It was not about Redback's business. It was about Quest's. It does not mention Redback. There's nothing about Redback in there, nothing about accounting problems or anything like that at Redback. It's excerpt of record at 582, supplemental excerpt at 582. I don't really see the strength of that argument. If A sells 80%, 90% of its sales to B and B announces we've got major economic difficulties, we're not going to be in a position to operate at the high level we have in the past, then everybody who knows anything about those companies knows that A is in trouble even though it's never been mentioned. So in a few quarters, Quest accounted for more than 10% of Redback's revenue, never more than about 20%. So there was, say, a market did know that Quest was a Redback customer, and counsel's theory is that the market understood this Quest press release to really be about fraud at Redback, except that the problem with that theory is that he hasn't pled any facts to support it. He hasn't pled that any securities analyst released a report saying, uh-oh, investigation at Quest, there must be trouble at Redback. He hasn't pointed to a single industry expert, a single investor, a single reporter who made the link. The link exists only in the imagination of plaintiff's counsel, but that's not there now. As I recall, the press release said the SEC is investigating Quest buying from its customers, and Redback and everybody who follows Redback knows that that means Redback. No, Your Honor, because if everybody knew that, somebody would have said it. Some stock analyst, in fact, the world would have said it. The world would have said there's trouble at Redback. The investment community, not one fact alleged in the complaint, shows that anybody in the investment community interpreted this as trouble at Redback. And under this court's- A major law firm has 20% of its billings to a particular client, and the papers say that that client has trouble. Everybody knows that that law firm's going to be scrambling, even though the law firm's never mentioned it. But, Your Honor, if everybody knew it, then a stock analyst would have said it. If somebody, people were making the connection that there must be fraud at Redback, not just this is bad news for Redback because Quest is a customer and Quest won't buy as much in the future, but if everybody thought there was a fraud at Redback- Plaintiffs could have fled a fact where somebody said that. Well, and specifically, the PSLRA requires certain specificity in pleading about this. Is it your contention that in their complaint, the amended complaint, it turns out, that they simply did not plead, however you get there, sufficient facts to substantiate the lost causation? Correct. They didn't plead with the particularity, but also under this court's decision in Metzler v. Corinthian Colleges, this Court addressed precisely that issue. This Court said it's not enough for plaintiff merely to make the, quote, undocumented assertion that the market must have, quote, understood this to refer to a fraud. That's not enough, because that's too speculative. The plaintiff has to plead actual facts showing that there was a link. That's the Metzler v. Corinthian Colleges case, and that case found no lost causation pleaded for that reason, because there was no connection. The Court said, in fact, that if lost causation were allowed. So the theory is there's no causation because nobody thought Quest's problem in this respect had anything to do with Redback? The theory is that if that were the case, the plaintiff would have had to plead it, and they didn't plead it. And they had five amended complaints, and they never pled that anybody made the connection. This Court said in the Metzler case that it's not enough simply to assert that a particular disclosure was really a, quote, coded message about fraud, because that would abolish the lost causation requirement. You could always say the market must have understood this. You have to plead facts showing what the market understood, and that's one reason there's no lost causation. There's a second reason that there's no lost causation as a result of this disclosure, and that is because the stock price did not go down. The plaintiff has to plead not only that there was a revelation of fraud, but that it caused a loss. Well, on the last trading day before the Quest press release, Redback closed at $4.03. That was March 8, 2002. The release was on a Monday. On the next three trading days after the Quest release, before the opening of the market, Redback closed higher than the $4.03 that it had closed at before the release. And this is in the excerpt of record at page 48. The closing prices on each of the next three trading days exceed the closing price before this announcement. Now, if the market had understood there was a huge fraud at Redback, you should have seen a reaction here. You don't. So the plaintiff has failed to plead facts showing that there was actually a loss flowing from this press release. Well, plaintiff's theory is, wait a minute, there's a delayed reaction. Sometime more than three days later. The traditional analysis is that buy on the rumors, sell on the news, on the theory that the news has already been discounted. So recall is the usual pattern. Say you have to link them up. You have to link the stop, drop, and release. And that's what Metzler says, and it's only applying what the Supreme Court said in Dura. Maybe the traditional view was before insider trading law got so tight. And I would point out a couple of other things. First, that the plaintiff does say there was a delayed reaction here. But that's inconsistent with plaintiff's own theory of this case. The plaintiff is relying here on the fraud on the market theory. Seems like it would be more likely to be an earlier reaction. And the plaintiff doesn't plead anything about that. But the point is that the Supreme Court said in Dura that if the stock goes down, and this Court said in Metzler and other cases, that if the stock goes down first before the release, there's no loss causation. That's clear. I guess that's what doesn't make any sense to me. The way it always works in real life is the stock goes down before the bad news, then the bad news hits, then the stock goes up a little. And the reason is probably that the insiders talk to each other and everybody knows and word gets around. If that had happened, plaintiff's counsel could have pointed to some press release saying there are rumors of fraud at Redback. He can't. The first time there is anything about a potential fraud at Redback is November 2003, the very end of the class period. And in his first complaint, plaintiff pled that that was the revelation of the fraud. Then he discovered he had no damages because of the Dura case. So he went back and he tried to plead that the fraud was really revealed in 2001.  Absolutely. The revelation of the fraud. Not the way I'm saying it happens in real life. And it went down before and not after, so there's no causation. Dura, the Supreme Court in Dura and this Court's decisions following, clearly say that if it goes down before the announcement, there's no loss causation. You would have to point to something that entered the market. Clearly if they've never done any stock trading. You would have to point to news that entered the market that there was potential fraud at Redback and it never happens until the very end of the period here. The other thing I'd like to point out is that the plaintiff has pled in his complaint at paragraph 469, which is excerpt of record 243, that, quote, the market for Redback common stock promptly digested current information regarding Redback from all available sources and reflected such information in Redback's stock price. So he's saying that all information is promptly digested. He cannot now come up here and say, well, there was a delayed reaction. For three days it didn't happen because he has pled inconsistently with that. And, in fact, that's the fraud on the market theory that he's pleading there. And without that fraud on the market theory, he has no case. So he's got to admit that the information is promptly digested. A three-day delay doesn't cut it under the fraud on the market theory. Obviously what's going on is the plaintiff is reaching for a theory of loss causation here because what we're really talking about is just the tail end of the dot-com bubble. This company went from 150 to bankruptcy because, like a lot of other telecoms, its price got bid way up when everyone thought the Internet was exploding, and then everything fell off. That's also why Quest stopped purchasing products, for that matter. Your Honor, what I'd like to say now is turn to the – unless there are more questions about loss causation, I'd like to go to the misleading statement. Is there anything else we should understand about why there's no causation? Yeah. There's one other thing. That press release from Quest, Excerpt of Record 582, it says that all of this information was already in the market. Just read the press release on its face. It says the SEC has opened an informal investigation about a bunch of transactions that we've already been disclosed and that have been extensively discussed in the market. And if the information is in the market already, it's not a revelation of anything. And that's – so that torpedoes the plaintiff's case for a third reason on loss causation. I'd like to go now to the second major point, which is that the facts pleaded do not show that the defendants made a false or misleading statement. Now, let's be clear about what the theory is here. The plaintiff's theory is you reported these revenues, and they don't dispute that the revenues were real, that Redback really shipped product to Quest, that Redback got paid for it. They don't dispute any of that. And they don't dispute that the accounting was right. But what they're saying is Redback reported these real sales to Quest, but didn't tell us that it was obtaining these sales through, quote, bribery. But the bribery is not what Your Honor indicated earlier. There's no allegation that Redback is bribing employees. They're simply saying that Redback is also buying stuff from Quest. Redback is selling to Quest. I thought they also gave options or something like that to Quest people. To Quest. There was a warrant that went to Quest. And? Oh, it wasn't Quest people. It was Quest itself. Yeah. To U.S. Telsource, which is a sub of Quest. I'm sorry? The warrant went to U.S. Telsource, which is a subsidiary of Quest. That's what's pled. So, Your Honor, but the gist of their case is they're alleging that Redback was buying stuff from Quest, and that made it fraudulent somehow to report the revenues it was getting from Quest. So they weren't bribing purchasing agents. This was just, you know.  This is not a bribery of purchasing agent situation. Like the furniture store does business with the lawyer, and the lawyer rents space from the furniture store. The main allegations they've made. Have I got that right? Yeah. You've got it right. The main allegation they've made is that Redback was buying something called IRUs from Quest, which is the right to use broadband capacity, and that Redback was buying web hosting services from Quest, and that therefore these other independent transactions that Redback was making with Quest as a telecom company somehow tainted the revenues that Redback got from Quest. That's the main allegation here. I misread this, so it's very important that I get it right now. I had thought that they were giving benefits to individuals or classes of individuals at Quest in order to induce Quest as a company to do business with Redback, and you're saying that's not pleaded. That's not so. That's correct. I'm saying that what this case is about is they're claiming that by doing business with Quest itself, Redback was giving Quest an economic incentive to purchase its products, but that's not fraud. That's just doing business. If my law firm uses AT&T as a law business supplier and also has AT&T as a client, you can do that. There's nothing that says you can't do that. There's nothing in the securities laws or the accounting rules that says that doing business with someone who does business with you is improper or that it has to be disclosed. What was the SEC talking about then? I don't see anything dirty about that, actually. Well, the SEC investigated Redback but didn't do anything. They investigated Quest and they did something to people at Quest but not because of Redback. If State Farm is your biggest client, pretty good chance you'll get your insurance from State Farm. I don't understand what's dirty. There's nothing dirty. What they did was they've alleged that Redback was buying these IRUs and the web hosting capacity and there was one other thing that slips my mind at the moment, and that that's what motivated Quest to buy Redback's products. But there's nothing that says that you have to disclose that and there's nothing that says that it's bad revenue. There are accounting principles that are relevant about how things should be accounted for when you're doing business with a customer, but the plaintiffs haven't alleged that the accounting was wrong. The plaintiffs haven't even alleged what the accounting was or what it should have been, much less that it was wrong. So this is about doing business with a customer and the plaintiffs can't point to a single case holding that Redback's accurately reporting real revenue is misleading because Redback fails to disclose that it has other dealings with Quest or that Quest might be motivated to buy because of their mutual customers. There's no case holding that you contain real revenues. Now, plaintiffs quote other cases where the revenues were overstated or where they were adequately alleged to be overstated or where they were restated and the revenue wasn't real in those cases, but they don't challenge whether the revenue here was real. So this is not a situation where somehow Redback is failing to disclose that it's tainted revenue. It's just that the plaintiffs say you have to disclose why your customer was motivated to buy, but there's no proposition in the securities laws that requires that. Thank you, Your Honor. Thank you, counsel. Your Honor, what you were told was just not true. Number one. What part? This last part. Redback was bribing individuals. For example, there's a very specific instance where they hired a guy by the name of Bugsbee or Bugbee or something like that, gave his kid a job in return for a sale. Okay? Absolute quid pro quo bribery. Number two, Quest people went to jail for this stuff. Number three, and I want to go through that State Farm example. It would be fine to do business with State Farm if that's your largest client. It would be completely improper if you said, you know what, we live on top of a mountain that's never been flooded and we're going to buy from you $10 million worth of flood insurance, which no reasonable person would need in return for you giving us legal business. That's what they did. So, please, that story you just heard is not true. Could you point to the right paragraphs here? Yes, but I'm concerned because I'm going to have one minute and there's something else he said that wasn't true that I have to correct. Okay. Go for it. On page 44 of our brief, we give the closing prices. He said for three days it went up. Not true. On March 11th, the announcement is made in the morning before the stock opens. It's correct that the press release we just talked about doesn't mention Redback. It's the Quest press release. So you know what? During that day, people don't instantly make that connection. People do start making that connection after the close. And what happens? How long after? Immediately. From 430 on March 11th, it drops to 424 on March 12th, 407 on March 13th, 384 on March 14th, 372 on March 15th. Sounds to me like it's going down every one of those days. Now, maybe his argument would make sense if he turned around and said, well, you know, it did mention Redback right in the headline, and why didn't it drop that day? But it didn't mention Redback in the headline, and it took people, analysts, other folks time to think about it and say, okay, here's a problem at Quest. Who else is going to be related to the problem? What analysts indicated a problem? Well, Your Honor, we didn't plead any specific analysts did or did not. So there is no evidence in the complaint or in the record. We have to infer this plot on the market. We have to infer that the market didn't get it before, but they got it after the March 11th. At the pleading stage, where we do not have subpoena power to go to every one. I understand that. That's what I'm asking you. At the pleading stage, the court has to say that this announcement came out. Is it a logical inference? Because first of all, you have to only make logical inferences. It ultimately has to be a strong inference, but a logical inference that this would affect Redback. Then you say, well, what does the market price do compared to what, you know, the market price of the general market and the industry are doing? This drops substantially more. How many people know the same day? The sort of people that follow particular stocks tend to be aware of the relationships between businesses. Yes, sir. That they're following. Yes, sir. Now, I don't know. I think what's happened here is your adversary said it went up for three days instead of down. And you're saying, no, it went down for the subsequent two days. No, I'm saying on the day of the announcement, it did close up. The announcement's made in the morning. Subsequent two days. Every day after that. The next five days after that. The 12th, 13th, 14th, 15th. But why did it go up after the announcement? Well, it. Now, my own guess is it went up after the announcement because the press release wasn't as bad as everybody who was following these stocks expected it to be. I guess the. But the law really has this. The law doesn't follow this buy on the rumors, sell on the news notion. Why did it go down the same day? I think because not enough people made the connection to start selling. My stock analyst, back when I used to be able to buy stocks before I was a judge, my stock analyst was me. Right. And if I'd been serious in this company, I wouldn't be waiting for somebody who gets paid by who knows who. Agree. But you know what would happen is with that announcement might not come up on your screen because you would have your screen set for tell me everything that mentions Redback. And I acknowledge that this announcement didn't mention Redback. But as you started looking into the industry more and seeing that. Your screen would be set that way. My screen is I read the Wall Street Journal in the morning. I see something about the announcement, put it together myself. Why wouldn't some people do that? Some people might. Whether enough people did it immediately that day to drive the stock price down, I guess they didn't. Because it does take putting two things together. It's not just Redback is in trouble, Redback lied, Redback. An announcement like that you'd expect to see a cliff right away. A more subtle, partial announcement of Redback's largest client has been accused or investigated for playing games, that might take a day to get in. But that's all it does is take a day to get into the market. And then it starts dropping precipitously. I can't see the day. Back when I used to buy stocks, I thought Polaroid depended on the genius of Edwin Land, and there was essentially nothing more to the company. That meant if I had seen in the Wall Street Journal or heard as I woke up in the morning on the news that Land died, Polaroid's over. Yes. I wouldn't wait for an analyst to tell me. Agreed. But here's the interesting question. Would you have known to sell Lyondell Chemical, which is Polaroid's largest supplier of chemicals, to be able to do it? Now, I've made that up, but would you have known? If I was better than I actually was, yes. Or you might have said, okay, now I need to sit down and think about it. Who else is this going to affect? You'd go back to your office, you'd think about it, you'd realize, okay, it's going to have that effect, and the next morning you'd be selling Lyondell. That's what happened. That's what happened. Okay. Your Honor, did ask me to provide certain sites. I've noticed that everyone else has been asked for a 28-J letter. Maybe that would be the appropriate way to do that. But I will give you specific sites. We would be on the raft if we didn't get one. As to who is, you know, who specifically was bribed, whether it's corporations, individuals,  Very good. Thank you, counsel. Thank you, Your Honor. Connecticut Retirement Plans v. Price Waterhouse is submitted. You're adjourned for the morning.
judges: Tg Nelson, Kleinfeld, M. Smith, Cjj